UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No.: 3:13-cr-50-J-34JBT

DENNIS BURTON

_____/

### REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant Dennis Burton's Motion to Suppress (Doc. 16) ("Motion") and the Government's Response in opposition thereto (Doc. 21) ("Response"). The undersigned held an evidentiary hearing on August 5, 2013. (Transcript ("Tr.") at Doc. 29.) The undersigned ordered supplemental memoranda regarding additional issues raised at the hearing (Doc. 26), which both the Defendant (Doc. 32) and the Government (Doc. 31) have supplied. The matter has therefore been fully briefed and is ripe for disposition. For the reasons given below, the undersigned respectfully **RECOMMENDS** that the Motion be **DENIED**.

_____

[1] Within fourteen days of service of this document, specific written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local Rules, United States District Court, Middle District of Florida. Failure to file a timely objection waives a party's right to review. Fed.R.Crim.P. 59.

### I.    Issues Presented and Summary of Recommendation

Defendant is charged in a two-count indictment with conspiring to distribute benzylpiperazine ("BZP") and possessing a firearm in furtherance of that conspiracy.  (Doc. 1.)  The evidence presented at the hearing showed that on September 9, 2010, Anthony Lawrence sold $10,500 worth of pills to undercover Drug Enforcement Administration ("DEA") Special Agent Robney Bradshaw.  (Tr. 35.)  DEA agents then observed Lawrence leave the scene of the sale as a passenger in a blue Honda Accord.  Lawrence then exited that vehicle and entered the passenger side of a gray Mazda SUV while both vehicles were stopped at a nearby stoplight.  (Tr. 52–54.)  The Mazda eventually headed south on I-95.  At some point, DEA agents communicated with a Florida Highway Patrol ("FHP") drug interdiction unit, informing Trooper David Cimino that the passenger of the Mazda, which was identified by tag number and description, had sold drugs to an undercover DEA agent.  DEA requested that FHP pull the Mazda over to identify the occupants (Tr. 54–56) by conducting "a routine traffic stop" (Tr. 67–68).

When FHP troopers pulled the Mazda over on I-95 South, they identified Lawrence as the passenger[2] and Defendant as the driver.  (Tr. 76–77.)  In response to a question by FHP Trooper Phillip Payne, Defendant revealed that

---

[2]  Lawrence's name was unknown to DEA at the time.

2

he had a gun in the car.  Trooper Payne secured the gun for the duration of the stop and returned it to Defendant upon the stop's conclusion.  (Tr. 76–77.)  The FHP troopers told Defendant that he had been stopped for changing lanes without signaling.  Trooper Cimino issued Defendant a written warning to this effect.  (Tr. 80.)  The Government produced no evidence at the hearing that this or any other traffic infraction ever occurred.

Defendant has moved to suppress all of the evidence obtained as a result of this stop.  (*See* Doc. 16.)  He argues primarily that the FHP troopers lacked probable cause to believe that the purported traffic violation occurred.  (*See id.* at 3–7.)  Additionally, he argues that the troopers lacked reasonable suspicion to stop the Mazda based either upon Lawrence's participation in the undercover drug transaction or Defendant's own actions, because the troopers did not witness the transaction and the Government provided insufficient evidence that DEA adequately conveyed this information to the troopers.  (Doc. 32 at 8–9.)  Defendant also argues that, even if the stop was lawful, Defendant's response to Trooper Payne's question about the presence of weapons in the vehicle should be suppressed because Defendant was not given *Miranda* warnings.  (*Id.* at 5–6.)  Finally, Defendant argues that the troopers' misrepresentation of the stop as based upon a traffic violation—and particularly the creation of a false written warning to this effect—entitles Defendant to suppression under the Fourth Amendment.  (*Id.* at 12–13.)

The undersigned recommends that Defendant's arguments be rejected. Reasonable suspicion existed that both Defendant and Lawrence had engaged in criminal drug activity sufficient to justify an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  Lack of probable cause that Defendant committed the improper lane change was therefore irrelevant.  DEA's communication to the FHP troopers was sufficient to allow the troopers to lawfully stop the vehicle. *See, e.g., United States v. Hensley*, 469 U.S. 221, 231 (1985).  At the time Trooper Payne asked Defendant whether any weapons were in the car, Defendant was not in custody and therefore *Miranda* warnings were not required. *See Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984).  Finally, the fruits of the stop are not subject to suppression based upon the troopers' misrepresentation of the reason for the stop.  *See United States v. Rosario*, 305 F. App'x 882, 885–86 (3d Cir. 2009); *see also United States v. Powell*, 222 F.3d 913, 915 (11th Cir. 2000).

## II.  Evidence at Hearing

At the evidentiary hearing before the undersigned, the Government presented the testimony of three witnesses: DEA Special Agents Robney Bradshaw and Kurt Kaldor, and FHP Trooper Phillip Payne.  Notably, the Government did not call Trooper Cimino as a witness.  The Government also admitted two items into evidence: (1) a video recording of the stop at issue (Gov't Ex. 1) and (2) a written warning that the Florida Highway Patrol issued to

4

Defendant at the conclusion of this stop (Gov't Ex. 2).  Defendant testified on his own behalf.

### A.    DEA Special Agent Robney Bradshaw

Special Agent Bradshaw testified that, at the time of the hearing, he had been employed by DEA for over sixteen years and had worked in Jacksonville since February of 2004.   (Tr. 6.)   As part of his job he did "long-term investigations, wiretaps, undercover purchases [and] surveillance."  He received seventeen weeks of training at Quantico, Virginia, and had previously worked a number of investigations involving the aforementioned investigative techniques. (Tr. 6–7.)

Beginning in 2009, Agent Bradshaw engaged in several undercover drug transactions with a subject named Patrick Blackwood.  (Tr. 7–12.)  By March of 2010, Blackwood had moved from the United States and was no longer available for drug deals.  (Tr. 12.)  Blackwood informed Bradshaw that Blackwood's cousin would be in contact, and that this cousin would continue to sell him drugs. (Tr. 13–14.)  On August 31, 2010, Bradshaw received a series of phone calls from this unidentified cousin (Tr. 14), who investigators would later identify as Anthony Lawrence (Tr. 24–25).   The two arranged to meet at the Avenues Mall in Jacksonville, Florida, on September 9, 2010, so that Bradshaw could purchase 2,000 ecstasy pills from Lawrence for $10,500.  (Tr. 17.)

On that day, Bradshaw met Lawrence in the food court of the Avenues.  A

team of other DEA agents had set up surveillance around the area.  (Tr. 18.) Agent Bradshaw wore audio equipment that made it possible for the other agents to hear in real time what he and others were saying.  (Tr. 21.)  The purposes of this meeting were to consummate the transaction, identify the seller and any co-conspirators, and to "continue to climb the ladder."   (Tr. 19–20.)   The Government did not intend to make any arrests or reveal the identities of its agents.  (Tr. 39.)

At the meeting, Lawrence indicated that he was there with another individual, who was later identified as the Defendant, and who was present in the mall some distance from Bradshaw and Lawrence.  Agent Bradshaw testified:

> A.    We were sitting there, and we were discussing the transactions, he told me he had a guy here.  And I said, You got a guy?  And he was showing me the direction that the guy was in.
>
> Q.    How did he do that?
>
> A.    And—
>
> Q.    How did he do that?
>
> A.    Described Mr. Burton.  And I asked him—and he says, "Over there."  And I looked and I even asked him where, and at that time, Mr. Burton and I made eye contact and we kind of nodded at each other.

(Tr. 27–28.)

After some continued discussion, Bradshaw and Lawrence decided to conduct the drug sale in the parking lot of the mall, in Bradshaw's car.  (Tr. 33.)

6

As Bradshaw left the mall building, he observed Lawrence and Defendant going down the escalator and out of the building together.  (*Id.*)

Lawrence met Bradshaw at Bradshaw's undercover vehicle (which was equipped with audio and video recording equipment) in the mall parking lot.  (Tr. 34.)  Lawrence emerged from the passenger side of a blue Honda Accord, which backed into a parking space near Bradshaw's vehicle.  Bradshaw could not identify the driver of this vehicle.  (Tr. 35.)  Lawrence then entered Bradshaw's vehicle.  (Tr. 34–35.)  In his vehicle, Bradshaw paid Lawrence $10,500 for pills (purportedly ecstasy (Tr. 13)) and the two discussed potential future drug transactions.  (Tr. 35.)  Lawrence then left Bradshaw's car and returned to the Honda.  (*Id.*)  Bradshaw noted the Honda's license plate number and relayed it to the other agents in the area doing surveillance.  (Tr. 36.)

Agent Bradshaw testified that the "investigative plan" was for someone to contact FHP and have FHP conduct an investigatory stop of the vehicle Lawrence was traveling in, to "identify the individuals in the vehicle," under the guise of an ordinary traffic stop.  (Tr. 38–39.)[3]  Bradshaw's responsibility was to leave the scene and begin to process the pills, which he did.  (Tr. 38.)  He later learned Lawrence had "hooked up with another vehicle," and exited the Honda

---

[3] On December 9, 2009, FHP had conducted a similar stop, at DEA's request, involving Patrick Blackwood.  (Tr. 8–10.)

and entered that other vehicle. (Doc. 37.)  He further learned that FHP conducted the planned-upon stop of this other vehicle and that Lawrence and Defendant were identified.  (Tr. 40.)

On cross-examination, Bradshaw testified that he had reviewed "the various police reports or reports sent to the defendant in discovery." (Tr. 41.)  In those police reports, the FHP Trooper stated that he stopped the car for an illegal lane change.  (Tr. 41–42.)  Agent Bradshaw expected that any stop made by FHP would comply with the law.  (Tr. 45.)  Bradshaw admitted that he never spoke to Defendant (Tr. 44), and that his making of eye contact and nodding with Defendant would not appear on the audio recording of his meeting with Lawrence.  (Tr. 42).  Lawrence did not describe Defendant as his friend, colleague, or partner, but rather stated that Defendant was his "guy," or something similar.  (Tr. 43–44.)  Bradshaw did not see Defendant driving the Honda.  (Tr. 44.)  Bradshaw testified that Agent Kaldor witnessed the Honda meet up with the other vehicle, and that Bradshaw did not witness that event personally.  (Tr. 47.)  Finally, Bradshaw did not think he was the one who communicated with FHP regarding the stop, but someone did communicate to FHP "the drug transaction" and the identity of the vehicle containing the drug seller.  (Tr. 38, 46–47.)

### B.    DEA Special Agent Kurt Kaldor

Special Agent Kaldor testified that he is stationed in Jacksonville and, at

8

the time of the hearing, had worked for DEA for the past nine and a half years. (Tr. 50.)  He was part of the team accompanying Agent Bradshaw on his September 9, 2010 undercover purchase of pills from Anthony Lawrence at the Avenues Mall.  (*Id.*)  Agent Kaldor's main role was surveillance.  (Tr. 51.)  He had the ability to hear what was happening with Bradshaw in real time through Bradshaw's recording device.  (*Id.*)

At the conclusion of Bradshaw's drug transaction with Lawrence, Bradshaw provided Kaldor and the other agents conducting surveillance with a description of the vehicle in which Lawrence was riding.  (Tr. 52.)  Agent Bradshaw described the vehicle as a blue Honda Accord and provided the vehicle's tag number.  Agent Kaldor observed this blue Honda Accord as it was leaving the mall.  (*Id.*)

Agent Kaldor followed the blue Honda Accord "southbound through the mall towards the exit onto Phillips Highway."  (Tr. 53.)  There, Kaldor observed the Accord stop at a red light.  Kaldor further testified:

Q. And what happened at this exit ramp off of Phillips Highway?

A. Right at the exit, the passenger in the front passenger side of the vehicle exited the Honda and went back to a car right behind it, which was a gray Mazda SUV, and he entered the front passenger—front passenger door of that vehicle.

Q. So the passenger in the blue Honda got out and got into the passenger side of this Mazda SUV?

A. Correct.

9

(*Id.*)

After the light turned green, Kaldor followed the Mazda and obtained a license plate number.  (Tr. 54.)  He relayed this information to the other members of the team over his radio and continued to follow the Mazda as it got on I-95 and proceeded south.  (Tr. 54–55.)  The plan was for a law enforcement agency to pull over this vehicle "to identify the individual that conducted the transaction with Agent Bradshaw and also any individuals that he may be with."  (Tr. 55.)  Agent Kaldor never testified that he was able to identify the driver of the Mazda.

Eventually, Kaldor decided that he had followed the Mazda long enough and that he did not want to appear suspicious to the Mazda's occupants.  (Tr. 55.)  After confirming that another officer was available to take over the pursuit, Kaldor exited off I-95 and waited a short time before he got back on the interstate and continued south.  (Tr. 55–56.)  A mile or two past State Road 16, Kaldor observed that FHP troopers had pulled over the Mazda.  (Tr. 57.)  Agent Kaldor continued down to State Road 206 and waited there until his group supervisor said that he was finished for the day.  (Tr. 57–58.)

On cross-examination, Kaldor testified that he did not personally ask FHP to stop the Mazda.  (Tr. 58.)  However, DEA investigators had planned all along to have FHP pull over the vehicle Lawrence was in after the drug transaction had occurred.  (Tr. 59–60.)  The reason FHP pulled the Mazda over was that "the individual that conducted the drug transaction was in that vehicle."  (Tr. 60.)  The

10

reason FHP gave Lawrence and Defendant for the stop, that the car had illegally changed lanes, was a "ruse."  (*Id.*)    Agent Kaldor testified that it is "common practice" to make up a reason to stop an individual that officers perceive to be involved in a drug transaction.  (Tr. 63.)   However, usually such an individual actually commits some kind of traffic infraction before he is pulled over.  (*Id.*)  But Kaldor did not see the driver of the Mazda commit any traffic infraction and he "was not paying attention to that."  (*Id.*)

### C.    Florida Highway Patrol Trooper Phillip Payne

Trooper Payne  testified that, at the time of the hearing, he had been employed as a state trooper with FHP for eleven years.  (Tr. 64.)  For roughly the past three years, he worked as part of FHP's criminal interdiction unit, which works with other law enforcement agencies in combating drug crimes.  (Tr. 64–65.)  On September 9, 2010, he was working on a two-man team with another trooper named David Cimino.  (Tr. 65.)  Unlike Bradshaw and Kaldor, Troopers Payne and Cimino each drove a marked car.  Each car was equipped with a digital video recorder that saves video from 30 seconds before a trooper engages his car's blue lights to when the blue lights are turned off.  (Tr. 65–67.)

On September 9, 2010, Trooper Cimino told Trooper Payne that DEA had purchased a large amount of pills from someone at the Avenues Mall and that

the "target vehicle" was going southbound on I-95.  (Tr. 67.)[4]  Trooper Cimino also told Trooper Payne that DEA requested that the troopers "make a routine traffic stop for the sole purpose of identifying the passenger."  (*Id.*)  However, with regard to other occupants of the vehicle, it would be Trooper Payne's regular practice to get "ID's, insurance, registration, any of the routine traffic stop items you might get."  (Tr. 70.)  Trooper Payne testified that it was "a regular part" of his duties to assist law enforcement officers by stopping a vehicle and "mak[ing] it look separate and apart from any undercover activity that may have taken place." (Tr. 68.)

Trooper Payne stated that he helped Trooper Cimino with the stop of the Mazda and that a video (but not audio) recording of the stop was made.  (Tr. 68.) The Government admitted this video recording into evidence as Government's Exhibit 1.  (Tr. 69–70.)  The video was taken from Trooper Cimino's car.  (Tr. 70.) The video, which is approximately twenty-six minutes long and shows the entire stop, does not show Defendant committing any traffic violation.  (Gov't Ex. 1.)

During his review of a portion of the video during the hearing, Trooper Payne observed that he retrieved a handgun from the driver's side of the Mazda during the stop.  (Tr. 76.)   Trooper Cimino obtained identification documents

---

[4]   On cross-examination, Trooper Payne testified that he had no direct contact with DEA.  (Tr. 87.)

from the Mazda's occupants.  (Tr. 76–77.)  Lawrence had foreign identification, so Trooper Payne ran Lawrence's fingerprints through a portable fingerprint scanner.  (Tr. 78.)  Trooper Payne returned the handgun to Defendant's vehicle at the conclusion of the stop.  (Tr. 77.)  He took the gun only to secure it during the stop and did not recall any issues with it.  (Tr. 77 & 80.)  It is his routine practice as part of a traffic stop to ask whether there are any weapons in the vehicle because "I like to be aware if there's a gun in the car."  (Tr. 79–80.) Finally, he testified that Trooper Cimino issued a written warning to Defendant for improper lane change.  The Government admitted a copy of this warning into evidence as Government's Exhibit 2.  (Tr. 83.)  Defendant and Lawrence were then allowed to proceed on their way.  (Tr. 80–83.)

On cross-examination, Trooper Payne conceded that he did not see Defendant commit any traffic offense and that he was not in the area when the traffic infraction is alleged to have occurred.  (Tr. 83.)  He admitted that it is not common to issue a warning when no traffic offense is committed (Tr. 84), and that "in general" he would "see a problem" with "pulling over a person for a traffic offense and it turns out that the allegation is untrue."  (Tr. 90.)

Trooper Payne also testified that Defendant had a concealed weapons permit.  (Tr. 84–85.)  He acknowledged that the camera from his vehicle was not on, and stated that he does not know why the camera from Trooper Cimino's vehicle did not record audio.  (Tr. 85.)  He acknowledged that Defendant was not

free to leave after he was pulled over. (Tr. 87.)   Although a person is normally told why he has been detained, Trooper Payne was not aware of anyone telling Defendant that he had been pulled over as part of a criminal investigation.   (Tr. 87.)   Finally, he testified that Defendant was cooperative and law abiding throughout the course of the stop.   (Tr. 88.)

### D.   Defendant Dennis Burton

Defendant also testified at the hearing.   (Tr. 91.)   He testified that he recalled being pulled over on the day in question.   (Tr. 92.)   He stated that he was driving on I-95 South, that he did not remember committing any traffic offense prior to being pulled over, and that he followed every instruction given by the troopers.   (*Id.*)

### E.   Findings of Fact and Credibility of Witnesses

The undersigned finds no reason to doubt the overall credibility of the Government's witnesses and adopts the above summary of their testimony as findings of fact, as supplemented or harmonized below:[5]

1.   Defendant did not commit any traffic violation but such a violation was not the reason for the stop.

---

[5] The undersigned also finds credible the portion of Defendant's testimony summarized herein.

14

2.      At the time of the stop, the identity of the Mazda's driver was unknown.  Neither the DEA agents nor the troopers knew whether the driver was Lawrence's "guy" from the mall.

3.      Before the stop, DEA communicated to FHP that the passenger of the Mazda had just engaged in a drug transaction with an undercover DEA agent.  DEA asked FHP to stop the vehicle to identify its occupants for this reason.

4.      Trooper Payne holds the personal opinion that he would "in general . . . see a problem" with "pulling over a person for a traffic offense and it turns out that the allegation is untrue."  (Tr. 90.)  However, whether there is any "problem" of constitutional dimensions with the stop in this case is an issue for the Court to decide.

### III.    Analysis

The undersigned recommends that the Government lawfully obtained the subject evidence, and therefore the Motion should be denied.   In making this recommendation, the undersigned concludes that (1) the stop of the Mazda was lawful; (2) Trooper Payne lawfully asked Defendant whether any weapons were in the vehicle; and (3) the fact that the troopers informed Defendant that he had been stopped for a traffic violation that does not appear to have occurred, and gave him a warning for same, does not warrant suppression.

## A.    The stop of the Mazda was lawful.

The Fourth Amendment protects the public against unreasonable search and seizure of their persons, houses, papers, and effects. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

One of these exceptions is the *Terry* stop. *See generally Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry* and its progeny, "'law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity.'" *United States v. Williams*, 619 F.3d 1269, 1271 (11th Cir. 2010) (quoting *United States v. Hensley*, 469 U.S. 221, 226 (1985)). Such reasonable suspicion exists if an officer "'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" *Id.* at 1271 (quoting *Terry*, 392 U.S. at 20). Investigators "'are not automatically shorn of authority to stop a suspect . . . merely because the criminal has completed his crime and escaped from the scene.'" *Id.* (quoting *Hensley*, 469 U.S. at 228). "'[I]f police have a reasonable

suspicion, grounded in specific and articulable facts, that a person they encounter was involved in . . . a completed felony, then a *Terry* stop may be made to investigate that suspicion.'" *Id.* (quoting *Hensley*, 469 U.S. at 229).

Here, reasonable suspicion clearly existed that Lawrence had recently committed a felony.  Special Agent Bradshaw testified that, shortly before the stop, Lawrence had sold him $10,500 worth of pills.  (Tr. 35.)  Lawrence represented that the pills were ecstasy (Tr. 13), although from the indictment it appears they were in fact BZP, a schedule I controlled substance (*See* Doc. 1 at 1).  Reasonable suspicion as to Lawrence alone is sufficient to justify the stop, even if such reasonable suspicion was lacking as to Defendant.  "Of course, police may also stop a car solely to investigate a passenger's conduct." *Brendlin v. California*, 551 U.S. 249, 257 n.3 (2007).

Moreover, the undersigned recommends that reasonable suspicion also existed as to Defendant at the time of the stop.  Kaldor observed Lawrence leaving the Avenues Mall, after completing a significant drug deal, in a blue Honda Accord with an unknown driver.  (Tr. 52.)  Kaldor then witnessed the Honda stop at a traffic light at the mall exit.  He saw Lawrence emerge from the vehicle, on the roadway, and get into the front passenger seat of a gray Mazda SUV located immediately behind the Honda.  (Tr. 53.)

The agents did not know the identity of the driver of the Mazda at this time or that he was the same person who was seen in the mall with Lawrence.  But

the driver picked-up a known drug dealer in this strange manner immediately after the dealer had concluded a significant drug sale, and then he proceeded to the interstate. This behavior supports a reasonable suspicion that the driver had knowledge of the drug deal and participated in it, even if only as a get-away driver. *See United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989) (holding that DEA agents had reasonable suspicion that a detainee was involved with criminal activity at least in part because she was "seen walking together with a known drug dealer who had negotiated with one of the agents for the delivery of fifteen grams of cocaine").

Defendant argues in his Supplemental Memorandum that the stop was nevertheless illegal.  He argues that the Government failed to prove that reasonable suspicion gathered during and after the undercover operation was sufficiently conveyed to Trooper Cimino, who actually performed the stop, and who did not testify at the suppression hearing.  (Doc. 32 at 8–9.)  Therefore, even assuming the DEA agents may have had reasonable suspicion to stop Defendant's vehicle, Trooper Cimino did not.  (*Id.*)

This argument is unavailing.  "'[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another.'"  *Hensley*, 469 U.S. at 231 (quoting *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir. 1976)).  The information need not be detailed.  "'[O]fficers, who must often act swiftly, cannot be expected to

cross-examine their fellow officers about the foundation for the transmitted information.'" *Id.* (quoting *Robinson*, 536 F.2d at 1299).  The Supreme Court has therefore concluded that:

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.

*Id.* at 232 (internal citations omitted).  Furthermore, the legality of the stop does not turn on "whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance."  *Id.* at 231.

The Eleventh Circuit has rejected an argument similar to Defendant's and held that "[r]easonable suspicion is determined by the *collective* knowledge of the officers involved in the stop."  *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).   In *Glinton*, the Eleventh Circuit specifically rejected a defendant's argument that the subject evidence should be suppressed because "the officers who actually stopped his car were not members of the 'task force' who had observed the suspicious activity."  *Id.*  "The fact that the task force officers who ordered the stop by radio had reasonable suspicion to believe [a suspect] was carrying drugs satisfies the *Terry* requirements for an investigative stop."  *Id.*

Here, Trooper Payne testified that Trooper Cimino told him that DEA had

asked the troopers to stop Defendant's vehicle (Tr. 67), which was clearly identified by tag number and description (Tr. 54).  Trooper Cimino said that DEA had purchased a large amount of pills from someone at the Avenues Mall, that the "target vehicle" was going southbound on I-95, and that DEA requested the troopers make a "routine traffic stop" of the vehicle.[6]  (*Id.*)  Per controlling case law, the relevant inquiry is not whether Trooper Cimino personally observed acts justifying reasonable suspicion, but whether the DEA agents who ordered the stop observed such acts and asked FHP for assistance.  *Id.*

Although the Government did not clearly establish which DEA agent communicated with Trooper Cimino, it did establish by a preponderance of the evidence that at least one DEA agent involved in the operation did so, which is the only reasonable inference from the evidence presented.  The DEA agents involved in the undercover operation were able to hear Bradshaw purchase drugs from Lawrence in real time (Tr. 21 & 51).  Further, Bradshaw and Kaldor shared their observations with the other agents via radio throughout the operation.  (*See* Tr. 36 & 54–55.)  Thus, it is evident that the DEA agent who spoke to Trooper Cimino was aware that a passenger of the clearly identified

---

[6] "[A]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."  *United States v. Raddatz*, 447 U.S. 667, 679 (1980*); see also United States v. Franklin*, 284 F. App'x 701, 703 (11th Cir. July 1, 2008) (quoting *Raddatz* for this proposition).

"target vehicle" had sold a large amount of pills to an undercover DEA agent. (*See* Tr. 67.)  It is also evident from Trooper Payne's testimony that the reason for the stop was the drug sale.  (Tr. 67.)  The stop of the Mazda was therefore lawful.

Defendant relies on *State v. Bowers*, 87 So. 3d 704 (Fla. 2012), to argue that the "fellow officer rule" does not apply because Trooper Cimino did not testify at the hearing.  But *Bowers* is inapplicable here.  First, it is a Florida case that does not control this Court.  Moreover, even if it did, it would not alter the undersigned's recommendation because it is distinguishable.  In *Bowers*, the Florida Supreme Court held that the "fellow officer rule":[7]

> does not allow an officer who does not have firsthand knowledge of the traffic stop and was not involved in the investigation at that time to testify as to hearsay regarding what the initial officer who conducted the stop told him or her *for the purpose of proving a violation of the traffic law so as to establish the validity of the initial stop*.

*Id.* at 705 (emphasis added).

In the case at bar, the Government did not have to prove that a purported traffic violation actually occurred, as that was not the basis for the stop.  The drug

---

[7] The term "fellow officer rule" is used frequently by the Florida courts to describe the collective knowledge doctrine applied in *Hensley* and *Glinton*, discussed above. *See Terrell v. Smith*, 688 F.3d 1244, 1252 (11th Cir. 2012) (observing that "both the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer," and citing to *Hensley* and a case on Florida's "fellow officer rule" in support).

deal and surrounding events, not the traffic violation, validates the stop.  *Bowers*, if controlling, would preclude the Government from calling only Trooper Cimino or Trooper Payne to testify what they were told regarding the drug sale in order to establish that the drug sale in fact occurred.  The Government did not do this.  It called the agent actually participating in the sale, Agent Bradshaw, and the agent who personally observed Lawrence switch vehicles, Agent Kaldor, to establish the basis of the stop.  Therefore, *Bowers* is inapplicable.[8]

### B. Trooper Payne lawfully asked Defendant whether he had any weapons in the car.

Trooper Payne testified that he removed a handgun from the driver side of the Mazda.  (Tr. 76.)  This is also observable on the video recording.  (Gov't Ex. 1.)  He testified that he routinely asks whether there are any weapons inside of the vehicles he stops.  (Tr. 79–80.)  Defendant argues that this questioning was improper.

Defendant's chief argument is that he was not given required *Miranda* warnings before Trooper Payne questioned him.   *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).  (*See* Doc. 32 at 5.)   However, a suspect is entitled to *Miranda* warnings only upon custodial interrogation.  *See Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984).  The line between mere detention and

---

[8] In addition, it is unknown whether the Eleventh Circuit would agree with the rationale of the Florida Supreme Court in *Bowers*.

such custodial interrogation "is one of extent, with the line of demarcation resulting from weighing of a 'limited violation of individual privacy involved against the opposing interest in crime prevention and detection and in the police officer's safety.'" *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004) (quoting *Dunaway v. New York*, 442 U.S. 200, 209 (1979)).   In drawing the line between a *Terry* stop and an arrest, the Eleventh Circuit evaluates the detention in light of four non-exclusive factors: "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Id.* (quotation omitted).

The Supreme Court has held that custodial interrogation does not typically occur during a routine traffic stop.   *See Berkemer*, 468 U.S. at 439–40. In reaching that determination, the Supreme Court recognized the same is true for *Terry* stops:

> [T]he usual traffic stop is more analogous to a so-called "Terry stop" than to a formal arrest.   Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion.   [T]he stop and inquiry must be reasonably related in scope to the justification for their initiation.   Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.   But the detainee is not obliged to respond.   And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be

> released. *The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of* Miranda.  The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Id.* (internal citations and quotation marks omitted) (emphasis added).

Here, Defendant was detained pursuant to a lawful *Terry* stop.  The circumstances surrounding his detention were unexceptional.  They were, in fact, designed to mimic the circumstances of the sort of "usual traffic stop*" Berkemer* addresses.  (*See* Tr. 68.)

Regarding the relevant factors, the stop of Defendant's vehicle served the valid law enforcement purpose of identifying individuals known or reasonably suspected to be involved in drug trafficking.  *See Acosta*, 363 F.3d at 1146.  Second, the troopers diligently pursued their investigation.  They obtained routine traffic stop items from the driver and identification from both the driver and passenger (*see* Tr. 70, 76–77), ran the fingerprints of the passenger because of his foreign identification (Tr. 78), and retrieved, secured, and returned the firearm (Tr. 76–77).  Third, the detention and related investigation were limited in scope and intrusiveness.  *See id.*  Neither Lawrence nor Defendant was asked to exit the vehicle or was physically searched.  The vehicle itself was not searched.  The occupants were not handcuffed or otherwise subjected to physical restraint other than remaining in the car.

Finally, the stop lasted approximately twenty-six minutes. This appears to be a reasonable amount of time to conduct the investigation in the circumstances. On the video recording, the troopers are shown questioning Lawrence and Defendant for a short amount of time and obtaining Lawrence's fingerprints. Most of the video shows Lawrence and Defendant alone in the vehicle. The troopers are off camera but, according to Trooper Payne's testimony, were checking on the information they had received from Lawrence and Defendant (Tr. 78–79). The Eleventh Circuit has noted that there is no rigid timeline regarding the permissible duration of a *Terry* stop, *Acosta*, 363 F.3d at 1147, and has allowed a *Terry* stop that lasted approximately seventy-five minutes, *see United States v. Gil*, 204 F.3d 1347, 1350–51 (11th Cir. 2000). There is no indication that the subject stop was unreasonably lengthy.

Considering the totality of the relevant factors, the stop did not exceed the permissible bounds of *Terry*. Neither Defendant nor Lawrence was "subjected to treatment that renders him in custody for practical purposes." *Berkemer*, 468 U.S. at 440. Defendant's rights under *Miranda* were therefore not implicated. *Id*.; *see also United States v. Jolly*, Case No. 08-80129-CR, 2009 WL 150662, at *4–5 (S.D. Fla. Jan. 28 2009).

In addition to not running afoul of *Miranda*, Trooper Payne's question to Defendant about the presence of weapons in the vehicle was well within his authority under *Terry*. An officer's investigation under *Terry* must be "reasonably

25

related in scope to the circumstances which justified the initial stop." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humbolt Cnty.*, 542 U.S. 177, 188 (2004).  A *Terry* stop does not open the door to indefinite and searching inquiry.  However, the Eleventh Circuit has held that even asking a detainee during a traffic stop whether he has any weapons in his vehicle may be permissible. *See United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001).  "[R]easonable safety concerns" may justify such an inquiry.  *Id.*

In *United States v. Purcell*, the Eleventh Circuit found such reasonable concerns present because (1) an officer stopped a detainee in a "very high crime corridor, where armed drug couriers ply their trade daily"; (2) there were irregularities in the rental contract related to the stopped vehicle; and (3) the detainee had a record for drug crimes.  *Id.*  The undersigned recommends that even greater safety concerns existed in this case because Defendant was transporting a known drug dealer who was carrying $10,500 in cash from the proceeds of a recent drug sale. It was reasonable for the troopers to be concerned about their safety. [9]

---

[9] Moreover, such reasonable safety concerns would likely also have justified a frisk of Defendant and Lawrence.  "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer where he has reason to believe that he is dealing with an armed and dangerous individual."  *Terry*, 392 U.S. at 27.

(Continued on next page . . .)

Finally, the Eleventh Circuit has held that even "unrelated questions posed during a valid *Terry* stop do not create a Fourth Amendment problem unless they 'measurably extend the duration of the stop.'"   *United States v. Griffin*, 696 F.3d 1354, 1362 (11th Cir. 2012) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).   The question about weapons in the case at bar did not extend the stop. An "officer's single unrelated question during [a] traffic stop about weapons and narcotics, which took up several seconds, [does] not render the traffic stop an unreasonable seizure under the Fourth Amendment."   *See id.* (citing *United States v. Everett*, 601 F.3d 484, 495–96 (6th Cir. 2010) for this proposition). Such a case is "not remotely close."   *Id.*   Furthermore, Trooper Payne testified that he held the gun only until the stop was over.   (Tr. 77.)   Therefore, even assuming the question about weapons was unrelated to the stop, it was permissible because it did not extend the duration of the stop.

---

(. . . continued)

Trooper Payne did not explicitly testify that he suspected either Defendant or Lawrence was armed.   Instead, he testified that he "routinely" asks whether someone he stops has a weapon because "I like to be aware if there's a gun in the car."   (Tr. 79–80.)   However, the question is not whether Trooper Payne "'actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search.'"   *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (quoting *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005)).   Here, the undersigned recommends that such reasonable suspicion did exist.

### C.   The false explanation for the stop, and written warning, that the troopers gave Defendant does not require suppression.

Finally, Defendant argues that his Fourth Amendment rights were somehow violated by the false explanation for the stop, and written warning, Troopers Payne and Cimino gave Defendant.   (Doc. 32 at 12–13.)   Although Trooper Cimino issued Defendant a written warning for lane change without signaling (Tr. 80; Gov't Ex. 2), the Government presented no evidence that Defendant in fact committed this or any other traffic violation.

Defendant argues in his Supplemental Memorandum:

The presentation of this type of evidence has served to impugn the credibility of Trooper Cimino, especially with the admission of the DEA agents that the ruse is a common practice used routinely to stop vehicles.   This is a clear violation of citizens [sic] Fourth Amendment rights and an illegal practice.   There is no excuse for this.

(Doc. 32 at 12.)

Defendant cites no law in support of this contention and the undersigned has found none.   On the contrary, the case law recognizes that a certain amount of deception is permissible in combating crime.   *See United States v. Russell*, 411 U.S. 423, 434 (1973) ("Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer."); *Lewis v. United States*, 385 U.S. 206, 208 (1966) (holding that a government intrusion into a home is permissible even though the government obtained an invitation to enter through

"fraud and deception").

Indeed, in *United States v. Rosario*, the Third Circuit considered an argument substantially identical to Defendant's in this case. 305 F. App'x 882 (3d Cir. 2009). The Third Circuit held:

> [Defendant] argues that the District Court erred in denying the suppression motion because the Trooper had no probable cause to . . . stop [Defendant's] vehicle for the ruse traffic infraction . . . . We disagree. Based upon the facts found by the District Court, the Government established probable cause to stop the vehicle to execute [an] arrest warrant. Thus, any alleged defect in the traffic stop and efforts by law enforcement to keep the drug investigation confidential is immaterial. . . . [E]ven if no traffic offense had occurred, [Defendant's] argument that the ruse traffic stop of his vehicle was unsupported by probable cause, and his reliance on the falsities in the police report, are meritless.

*Id.* at 885–86.

The Eleventh Circuit faced an analogous scenario in *United States v. Powell*, 222 F.3d 913 (11th Cir. 2000). In that case, a sheriff's deputy stopped a driver and passenger, suspecting that they were engaged in drug activity. When he stopped them, the deputy stated that "he was investigating the shoplifting of some bathing suits from K-mart," and he thereby obtained "consent to search for bathing suits 'or anything else' in the vehicle." *Id.* at 915. Although the *Powell* court did not explicitly consider the constitutional effect of this police conduct, it reversed the district court's suppression of the subject evidence. *Id.* Thus, based on the relevant case law and lack of authority to support Defendant's position, the undersigned recommends that the ruse for the stop and concomitant

written warning do not warrant suppression of the subject evidence.

## CONCLUSION AND RECOMMENDATION

The undersigned recommends that the evidence at issue in this Motion not be suppressed because it was discovered pursuant to a lawful *Terry* stop and related non-custodial questioning.  Trooper Cimino stopped Defendant's vehicle at the request of DEA agents who, based on personal observation and undercover participation, knew that Lawrence, and reasonably suspected that Defendant, had each engaged in criminal activity.  (Tr. 67.)  A question about whether Defendant had any weapons in his car was within the scope of the *Terry* stop and also did not impermissibly prolong it.  Finally, the false written warning did not render the otherwise lawful stop unconstitutional.

Accordingly, the undersigned respectfully **RECOMMENDS** that the Court **DENY** the Motion (**Doc. 16**).

**DONE AND ENTERED** at Jacksonville, Florida, on September 6, 2013.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record